1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF KENTUCKY
2                CENTRAL DIVISION AT LEXINGTON

3                          - - -
UNITED STATES OF AMERICA,       .  Case No. 5:20-CR-00103
4                               .
            Plaintiff,          .
5                               .  Lexington, Kentucky
        - v -                   .
6                               .  Thursday, June 17, 2021
VONNIE J. MCDANIELS,            .
7                               .
            Defendant.          .  **CLOSING ARGUMENTS**
8                          - - -

9        EXCERPTED TRANSCRIPT OF JURY TRIAL PROCEEDINGS
            BEFORE THE HONORABLE DANNY C. REEVES
10           UNITED STATES DISTRICT COURT JUDGE

11                         - - -

12

13  For the United States:     PAUL C. McCAFFREY, ESQ.
                               Assistant U.S. Attorney
14                             United States Attorney's Office
                               260 West Vine Street, Suite 300
15                             Lexington, Kentucky  40507

16  For the Defendant:         THOMAS C. LYONS, ESQ.
                               Thomas C. Lyons Law Offices
17                             201 West Short Street, Suite 800
                               Lexington, Kentucky  40507
18
    Court Reporter:            LINDA S. MULLEN, RDR, CRR
19                             Official Court Reporter
                               101 Barr Street
20                             Lexington, Kentucky  40507

21

22  Proceedings recorded by mechanical stenography, transcript
    produced by computer.
23

24

25

1                                              * * *

2          THE COURT:  All right.  Thank you.

3          At this time we will proceed with the closing arguments.

4   By rule, the United States does go first having the burden of

5   proof in the case, and may reserve some time for rebuttal

6   argument.

7          Mr. McCaffrey, are you ready to present your closing

8   argument to the jury?

9          MR. McCAFFREY:  Yes, sir.

10         THE COURT:  You may.

11         MR. McCAFFREY:  I'm ready to proceed.  We're going to use

12  some slides as we did in opening, turn this monitor so that --

13         THE COURT:  All right.  Just let me know when you're ready

14  to proceed.

15         MR. McCAFFREY:  Yes, sir.  We'll give it one more try,

16  Your Honor.  If it doesn't come up, we'll proceed without it.

17         THE COURT:  We had another proceeding here in the

18  courtroom yesterday, and it may have been that folks that were

19  here may have altered some of the equipment.  So if we need to

20  take a break and make sure everything is working, we will

21  certainly do that.

22         MR. McCAFFREY:  All right.  Thank you.

23         THE COURT:  All right.

24         MR. McCAFFREY:  It was on prior to your instructions, Your

25  Honor.  We did test and it was working, so I'm not quite sure

1    what the issue is.

2         Would it be all right if we took a five-minute recess and

3    we can try to get this up?

4         THE COURT:  Certainly.

5         Ladies and gentlemen, we'll take a brief recess at this

6    time and we'll make sure the equipment is operating properly

7    before we resume.  Hopefully it will be five minutes, but we'll

8    call you back as soon as we're ready to go.

9         Please keep in mind the admonition given to you

10   previously.  It does remain in effect.

11        (Jury left courtroom at 10:01 a.m.)

12        THE COURT:  I will tell the parties I found one

13   typographical error as I was reading the instructions, I'm sure

14   you noticed that on page, I believe, it's 22.  I've handwritten

15   in my change and initialed that as I did with the other that we

16   talked about that we're adding the word "cheat."  That's just

17   noted for the record that's my handwritten change.  We'll be in

18   recess.

19        (A recess was taken from 10:03 a.m. to 10:08 a.m.)

20        THE COURT:  Thank you.  All right.  Have our problems

21   worked out?

22        MR. McCAFFREY:  Your Honor, I believe we have it resolved.

23   Thank you.

24        THE COURT:  All right.  We'll bring the jury in.

25        (Jury entered courtroom at 10:09 a.m.)

1          THE COURT:   Ladies and gentlemen, I believe we have worked

2     out our technical difficulties and we're ready to proceed with

3     closing arguments at this time.

4          Mr. McCaffrey.

5          MR. McCAFFREY:   Thank you, Your Honor.

6          Good morning, ladies and gentlemen.   On Monday afternoon,

7     I stood here in this spot and I said that this trial would be

8     about Vonnie McDaniels lying to Kentucky Bank over and over and

9     over again to try to get something of value from that bank,

10    blatant lies for money.   And the evidence you've heard since

11    then proves exactly that.

12         What did he try to get with these lies?   First, a $382,000

13    loan that was issued after he lied about the cash he had in his

14    bank account.   Lied about his credit card balances.   Lied about

15    credit that he didn't have.   Lied about the terms of a lease

16    agreement.

17         Second, a break on repaying that loan once it was issued

18    where he used the COVID-19 pandemic as an excuse for his

19    financial trouble, and tried to bolster that lie with a fake

20    letter with Brien Hoover's name on it.

21         Now, these weren't just any lies.   This wasn't eggs for

22    breakfast as when he really had cereal.   These are lies that

23    mattered to the bank that he directed them to.

24         Ladies and gentlemen, the evidence shows that

25    Mr. McDaniels did exactly what he is accused of doing in the

1    indictment.   He committed two counts of bank fraud and he

2    committed aggravated identity theft.   The evidence shows beyond

3    a reasonable doubt that he's guilty.

4        What I want to do this morning is walk with you through

5    the elements of the offenses and the facts that prove each of

6    those elements beyond a reasonable doubt.

7        Along the way, I'm going to try to remember to remind you

8    of the exhibit numbers for documents that you saw during the

9    trial and where you can find these facts in the evidence.

10       You're going to have all of those exhibits back in the

11   jury room with you, and there may have been times during the

12   trial where we rushed through a document or it wasn't as

13   legible as you wanted it to be on the screen.   You'll have

14   those records with you and you can take your time and look

15   through them as much as you want.   My goal here today is remind

16   you of what that evidence was and to show you how it proves

17   that Mr. McDaniels is guilty.

18       Let's start then with the two counts of bank fraud.   The

19   Court instructed you on these offenses and you heard that there

20   are four elements that the government must prove beyond a

21   reasonable doubt.

22       First, the defendant executed a scheme to deceive the bank

23   and deprive of it of something of value.   And the scheme you

24   heard is just another word for a deliberate plan or a course of

25   action.

1        Second, that this course of action included one or more

2   material misrepresentations or concealment of material facts.

3        Third, that the defendant had the intent to deceive the

4   bank, the intent to deprive it of something of value.

5        Fourth, that the bank was federally insured.  And as the

6   Court instructed you, the parties have agreed that Kentucky

7   Bank was federally insured, so you don't need to spend time on

8   that element.

9        We'll focus on these first three.

10       The government does not need to prove, it is not an

11  element of bank fraud, that the plan worked, or that the bank

12  suffered financial harm or even that the defendant intended to

13  cause the bank financial harm.

14       If the defendant's intent was to get the loan under false

15  pretenses and to pay back that loan, that can still be bank

16  fraud if there was the intent to deceive and the deception

17  involved a material misstatement.

18       The first element, the plan to deceive Kentucky Bank and

19  deprive of it of something of value.  You saw in the evidence

20  that on April 4, 2019, Mr. McDaniels emailed Kentucky Bank with

21  a lot of financial records.  There are a number of attachments

22  to that email, that's Exhibit 5.  You'll have that email and

23  all of its attachments in evidence with you.

24       Why did he send this to the bank?  Well, you heard through

25  Agent Maloney's testimony that he admitted he sent this to the

 1   bank, sent this information, in an effort to obtain a loan,

 2   something of value.

 3       Two of the attachments to this email were his bank

 4   statements from the Navy Federal Credit Union.  That's

 5   Exhibit 1b.  You heard the testimony and you saw in the

 6   documents that those bank statements were false.  Mr. McDaniels

 7   added $40,000 to his savings account balance.  He admitted to

 8   Agent Maloney that he told the bank that lie and he admitted

 9   that he told the lie in order to improve his chances of getting

10   the loan.

11       You can see in Exhibit 1b the fake bank statements that he

12   sent to Kentucky Bank and you can compare them in Exhibit 1a,

13   with the real ones that were obtained from Navy Federal Credit

14   Union that show a $5 balance in that savings account.

15       What else did this course of conduct or this plan involve?

16   It involved sending a falsified lease agreement to the bank on

17   that same date.  You heard a lot of testimony about the lease

18   agreement, and you learned that Mr. McDaniels falsified two

19   provisions, paragraphs 3 and 4, by adding time to the length of

20   the lease.

21       Again, he admitted telling this lie to Agent Maloney and

22   he admitted that he told the bank this lie in order to improve

23   his chances of getting the loan.

24       Exhibit 2b is the falsified lease agreement, and

25   Exhibit 2a is the real lease agreement that was obtained from

1    the Commonwealth of Kentucky.

2         This course of action, this plan, it didn't stop on

3    April 4th, 2019.  It continued.  You heard the testimony and

4    you saw the evidence of two emails sent on the same day from

5    Mr. McDaniels to Gabe Brown, the lending officer.

6         Both of these emails were sent on June 25th, 2019.  They

7    are both in evidence, it's Exhibit 6b and Exhibit 7b.

8         6b attached two documents, both of them false.  The first

9    was another bank account statement, this time for the period of

10   June 2019.  It perpetuated the same lie that he had $40,000 in

11   that savings account.  Agent Maloney testified that he did not

12   have that money in this account at that time.

13        The other attachment to the first June 25th email was a

14   credit card statement that had been falsified.

15        You heard the testimony of the bank employees,

16   Mr. Swinford and Mr. Brown, about the significance of the

17   credit card balances to this loan.  Mr. McDaniels represented

18   that he had paid his credit cards down to zero, but you also

19   saw in the evidence the real credit card statement, Exhibit 6a,

20   which showed that to be a lie.

21        The second June 25th, 2019 email attached this home equity

22   line of credit statement.  This showed an available balance,

23   available credit that he could draw on to make a down payment

24   or to cover loan payments when necessary of $56,000.  That's

25   Exhibit 7b.

1     7a, the real equity home equity line of credit, showed

2     that the actual balance was $6,700, almost $50,000 less than

3     what he represented.

4     Now, Agent Maloney testified about his interview with

5     Vonnie McDaniels and you heard that in that interview, when

6     confronted with those lies, Mr. McDaniels admitted to some of

7     them.

8     But you also heard that he did not disclose others.  He

9     did not disclose to Agent Maloney these June 25th, 2019

10    misrepresentations, even when he was asked, are those all of

11    the false statements you made?

12    So even when confronted with his lies, he still tried to

13    minimize his conduct and downplay his falsehoods.

14    These misrepresentations are also part and parcel of the

15    same scheme, the same plan to deceive Kentucky Bank and to get

16    something of value, the loan that's part of Count 1.

17    But perhaps the most egregious effort to deceive the bank

18    came the following year, on April 6th of 2020, when

19    Mr. McDaniels lied again, this time about why he needed loan

20    forbearance.  This time attempting to exploit the COVID-19

21    pandemic for his own gain.

22    You saw this email, this is Exhibit 3, this is the email

23    that Mr. McDaniels sent to Mr. Brown on April 6th, 2020 that

24    says "Due to the worldwide pandemic happening, the state has

25    unform decided to suspend all rent payments until further

1   notice."  That was a flat-out lie.

2       You heard the testimony of Agent Maloney and Brien Hoover,

3   the state employee, that the state terminated this lease back

4   in December of 2019.

5       Now, COVID caused a lot of problems in Kentucky, but COVID

6   wasn't why Vonnie McDaniels could not make loan repayments.  He

7   couldn't make loan payments because the only tenant in that

8   building, the State of Kentucky, had left, it had terminated

9   the lease.  Instead of being upfront about that fact with the

10  bank, you saw the text messages with Gabe Brown where Vonnie

11  McDaniels lied about that too.

12      Now, we know from the evidence that he got the loan and we

13  know from the evidence that he did not get the loan

14  forbearance.  This was an attempt, it wasn't successful.  But

15  it was something of value.

16      I just want to take a moment to do some math, if you don't

17  mind.  You saw on the promissory note, that was Exhibit 9, how

18  much money Mr. McDaniels had to repay the bank every month in

19  principal.  That was $2,348.84.

20      He asked Gabe Brown, he asked Kentucky Bank, if he could

21  get deferment or interest-only payments for three to six

22  months, meaning he wouldn't be paying that principal amount for

23  three to six months.  If he had gotten three-month forbearance,

24  that would have worked out to around $7,000.  If he had gotten

25  six-month forbearance, that would have worked out to double

1    that, around $14,000.

2         Now, $14,000 is not a massive sum of money, but it's a lot

3    to someone with only $5 in that savings account.  And you heard

4    the testimony of Gabe Brown that the way these forbearances

5    typically work is that the deferred amounts were tacked on to

6    the back end of the loan.  This loan period was a 25-year loan.

7    So for another 24 years, Mr. McDaniels would not have had to

8    pay these amounts.

9         It had value.  It wasn't successful, but there was value

10   here that he was trying to get from the bank.

11        We submit to you, ladies and gentlemen, that these facts

12   and the evidence that you'll have with you in the deliberation

13   room prove to you that for both Counts 1 and 2, that there was

14   a plan here, a course of conduct to deceive the bank and to get

15   something of value from it.

16        I'm going to jump ahead here to element number 3, his

17   intent, because this really goes hand in hand with the plan,

18   the course of conduct.

19        How do you know that Mr. McDaniels intended to trick the

20   bank to lie to get something of value?  Well, we can start with

21   the most obvious answer, which is that he admitted to telling

22   almost all of these lies for the purpose of getting the loan.

23   He admitted to telling these lies for the purpose of obtaining

24   loan forbearance.

25        You heard about his confession through the testimony of

1    Agent Maloney.  And it wasn't just his words, he didn't just

2    tell that to Agent Maloney, we saw the records where he circled

3    and initialed the lies that he told the bank.

4         Exhibit 1c, this is his Navy Federal Credit Union

5    statement that he admitted he falsified with the circle and the

6    initial next to that $40,000.

7         Exhibit 2c, this is the lease agreement with the circle

8    and his initials next to the terms of the lease that he

9    acknowledged he altered, that he falsified.

10        Exhibit 4a, this is the letter that he fabricated that he

11   sent along with his request for loan forbearance.  He has

12   admitted doing exactly what he is accused of doing.

13        You can also answer this question of intent with common

14   sense.  You heard in the Court's instructions, use your

15   everyday experience, use your common sense when you consider

16   this evidence.

17        And if Mr. McDaniels wasn't trying to trick the bank to

18   get the loan, why did he fake up the bank account statement and

19   send it into them?  Why did he fake up the credit card

20   statement and send it into the bank?  Why did he change the

21   terms of lease agreement and send it into the bank?  He did all

22   of those things because it was his intent to deceive the bank

23   and to get something of value from it.

24        He wanted money from the bank, he wanted to keep the money

25   that the bank gave him and he was willing to lie to get those

1  things.

2      Gabe Brown, the lending officer, testified that at no

3  point in time did Mr. McDaniels disclose any of these

4  falsehoods to him.  He didn't say whoops, you got me.  He

5  didn't say, you know what?  I need to change that, I need to

6  correct this.  He held on to these lies.

7      Now, what else proves Mr. McDaniels' intent to lie for

8  money and proves this was not a mistake?

9      Again, you heard testimony from Agent Maloney and you saw

10  evidence of this Paycheck Protection Program loan application

11  where Mr. McDaniels once again fabricated documents and

12  falsified records.  He submitted this application seeking

13  $52,000 in a loan on the very same day he was interviewed by

14  Agent Maloney, May 15th, 2020.

15      It was on behalf of a company called V&R Foods, LLC that

16  claimed to have three employees and $21,000 in average monthly

17  payroll.

18      You saw the V&R Foods, LLC stopped existing as a legal

19  entity in October 2017, two and a half years before this loan

20  application was submitted.

21      You saw on Exhibit 15 that Mr. McDaniels sent in a

22  Form W-3 that represented the company's annual payroll.  It

23  represented that he filed something with the IRS called a

24  Form 941, a quarterly income tax return.  And you heard the

25  testimony of Agent Maloney that when he checked with the IRS,

1    the IRS confirmed that V&R Foods had never filed any form of

2    tax return whatsoever from 2017 to 2020.

3         You also saw that Mr. McDaniels gave the Paycheck

4    Protection Program, the PPP lender, an article that was

5    purportedly filed with the secretary of state, articles of

6    organization.  That document was dated June of 2016 and it

7    represented Mr. McDaniels' address to be 445 Hollow Creek Road

8    in Lexington.

9         You heard from Agent Maloney that Mr. McDaniels did not

10   own that property, 445 Hollow Creek Road, until 2018, two years

11   after the date that he represented on that document.

12        Nobody tells this many lies by mistake.  This wasn't an

13   accident.  It was intentional, and Mr. McDaniels' intent was to

14   trick Kentucky Bank for the loan in 2019 and to trick Kentucky

15   Bank for the loan forbearance in 2020.

16        Let's move to element number 2 of bank fraud, and this is

17   materiality.  And my guess is this is where the defendant's

18   going to focus his arguments, to try to get you to conclude

19   that none of these lies mattered.  But if you follow the

20   Court's instruction and you remember the evidence, use your

21   common sense.  The only reasonable conclusion here is that

22   Mr. McDaniels' lies were material.

23        The Court's instruction was as follows:  That a

24   misrepresentation or concealment of fact is material if it has

25   a natural tendency to influence or is capable of influencing

1    the decision of a person of ordinary prudence and

2    comprehension.

3         Did these lies have the natural tendency to influence the

4    bank's decision?  Were they capable of influencing the bank's

5    decision?

6         Now, the lie doesn't have to work to be material.  That's

7    not in the instructions.  Materiality doesn't depend on the

8    outcome.  It depends on whether it has the tendency to

9    influence the person to whom it's directed.

10        Now, remember the testimony of Jim Swinford, he was the

11   credit analyst for this loan, and he testified to some really

12   important parts about materiality.

13        He talked about this concept of liquidity, which is just

14   available assets, either cash or something that can be quickly

15   converted to cash, and why it mattered.  And it wasn't just so

16   that the borrower could make a down payment, although that was

17   important too.  It primarily mattered because liquidity or cash

18   on hand was going to be the source of repaying the loan if the

19   rental payments fell through for some reason.  The bank needed

20   some assurance that if that tenant were no longer in the

21   building, the borrower could still make loan repayments.

22        On Exhibit 8, this is Mr. Swinford's credit analysis, it

23   showed exactly that.  The primary source of repayment was going

24   to be the rental income.

25        And the secondary source of repayment was going to be the

1    borrower's personal income, what could he come up with to repay

2    the loan if necessary.  Because if that didn't work, the bank

3    was going to be in the position of having to foreclose on the

4    loan and liquidate the property.  This mattered to Kentucky

5    Bank.

6         The credit analysis, again, this is Exhibit 8, it also

7    reflects the materiality of a number of other issues that

8    Mr. McDaniels lied about.

9         You'll see there other under issues, it flagged his bank

10   account balance as a potential concern, even when it was

11   inflated by $40,000.  Even when Mr. Swinford thought he had

12   $40,000 in there instead of $5, it was a concern.

13        It also flagged his credit card balances as a potential

14   weakness.  And we know from the exhibits we already looked at

15   that Mr. McDaniels lied to the bank to fix that weakness.  He

16   lied about paying his credit card balances down to zero.

17        And both Mr. Swinford and Mr. Brown testified about the

18   importance of the term of the lease.  And again, Mr. Swinford

19   explained in his testimony that the longer the lease, the more

20   stable the income is expected to be at the property and

21   therefore the safer that loan is for the bank.  It's less risky

22   if you know the same tenant is going to be in the same building

23   under the same terms.  There's stability.

24        It absolutely mattered that there were additional years

25   added to that lease agreement.

1      And the fact that the lease also included a right of the

2   state to terminate within 30 days doesn't change the

3   materiality of the lie.  You heard the testimony of Mr. Hoover

4   that that provision, the 30-day termination provision, is

5   required by state law in every single lease agreement the

6   Commonwealth enters into.

7      You heard from Mr. Swinford that it's commonplace for

8   termination provisions like that to be included in lease

9   agreements that he considers.

10      And that between the boilerplate termination provision and

11   the length of lease that's written down, it's the length of the

12   lease that matters a lot more to him when he considers the risk

13   of making the loan.

14      Again, these misrepresentations were material and the

15   testimony of Mr. Brown and Mr. Swinford on that point we submit

16   was unequivocal.

17      Let me talk for a minute about the April 6th, 2020 lie as

18   well and why that was material, the lie about COVID-19.

19      Mr. Brown explained that at that time, March and April of

20   2020, the bank was focused on getting temporary relief to

21   customers, to borrowers whose business had been affected by the

22   COVID-19 pandemic.

23      And what Mr. McDaniels admitted to Agent Maloney was that

24   it was made clear to him by the bank that if he wanted to get

25   forbearance, if he wanted to get deferment, he would need to

1   show that his request was related in some way to the impacts of

2   the pandemic.

3       Now, the evidence that you saw in the text messages and in

4   the testimony of Mr. Brown was that sometime on April 1st or

5   April 2nd of 2020, Mr. McDaniels and Mr. Brown had a phone

6   conversation.  And during that conversation, Mr. McDaniels lied

7   to Mr. Brown and he said that the state had suspended rent

8   payments at 911 Leawood Drive after asking its work force to

9   work from home.

10      Gabe Brown told Mr. McDaniels in response, we need

11   documentation of that.  I will take your request for

12   forbearance to the credit committee if you can get me some

13   documentation.

14      And so on April 6th, 2020, that was Exhibit 3, the email

15   we saw, Mr. McDaniels sends him that documentation, the email

16   that lies about the impact of COVID on his business and the

17   fake letter purportedly from Mr. Hoover.

18      Of course that mattered.  Mr. Brown was asking him for

19   documentation from the state, asked him to prove that the state

20   had suspended rent payments, asked him for some evidence of

21   that.  And what he sent in was a lie.

22      He, Mr. Brown, would not have asked for that documentation

23   if it didn't matter.  The letter was the thing necessary to get

24   forbearance, and the letter was a complete lie.

25      The evidence was that Mr. Brown took the letter, that he

1    completed the paperwork for the forbearance request, and he

2    sent it into the credit committee at Kentucky Bank.  He acted

3    on it.  It wasn't just capable of influencing him, it did

4    influence him.

5        Now, did he catch his mistake and withdraw that

6    forbearance from the credit committee?  Thankfully, he did.

7        But the ultimate success of the scheme, ultimate success

8    of the lie isn't the point, don't be confused about that.  The

9    point is, was it capable of influencing the bank?  And here it

10   clearly did.

11       Ladies and gentlemen, see if there is an answer to this

12   question.  Why would Kentucky Bank ask for bank account

13   statements from a borrower if they weren't material?

14       Why would they ask for the lease agreement if its terms

15   weren't material?

16       Why would it ask for proof that credit card balances had

17   been paid down to zero if that didn't matter?

18       Why ask for a copy of the HELOC statement if that doesn't

19   matter?

20       They are not asking Mr. McDaniels for a copy of his high

21   school diploma.  They are not asking for a copy of his library

22   card.  They are asking for financial records that are important

23   to whether or not it makes the loan.

24       The evidence showed that the lies that Mr. McDaniels told

25   were material.  And as a whole, with respect to all three bank

1   fraud elements, the plan to deceive the bank and get something

2   of value, the intent to deceive the bank and get something of

3   value, and the materiality of those lies, the evidence here

4   proves overwhelmingly that all of those elements have been met.

5        Let me move on then to Count 3 of the indictment.  This is

6   aggravated identity theft.  As you've been told, the indictment

7   alleges that this crime occurred in connection with Count 2,

8   the April 6, 2020 bank fraud.

9        The facts of this offense are very straightforward and so

10  are the elements, so we'll just run through these quickly.

11       First, you'll need to find that he did in fact commit bank

12  fraud as alleged in Count 2.

13       Second, did he knowingly use the name of another person

14  without lawful authority?

15       Third, did he know that the name, that that identity

16  belonged to another person?

17       And fourth, was that use in relation to, was it in

18  furtherance of the crime that's alleged in Count 2, the bank

19  fraud?

20       I'm not going to repeat what we already talked about with

21  respect to Count 2, the evidence proves that that crime was

22  committed.

23       The second element, did he knowingly use Mr. Hoover's name

24  without lawful authority?  Yes, he did.

25       Mr. McDaniels admitted to Agent Maloney that he created

1　　the fake letter with Mr. Hoover's name on it and sent it in to

2　　Kentucky Bank with his request for loan forbearance.  It was

3　　not an accident.  He knew what he was doing.  Mr. Hoover

4　　testified that he did not authorize or consent to this use of

5　　his name.  So this element, use of the name without lawful

6　　authority, is met.

7　　　　　The third element, did Mr. McDaniels know that the means

8　　of identification, the name, belonged to another person?  And

9　　again, the answer is obvious.  It's yes.  The evidence was that

10　　Mr. McDaniels told Agent Maloney that he met with Mr. Hoover to

11　　sign a lease modification agreement.  Mr. McDaniels and

12　　Mr. Hoover met.

13　　　　　Mr. Hoover testified remembering either a telephone

14　　conversation or in-person conversations with Mr. McDaniels.

15　　And Mr. Hoover sent the termination letter to Mr. McDaniels

16　　when the lease was terminated.  That document is in evidence.

17　　And indeed, that document, that letter actually came from

18　　Mr. Hoover.  It appears to be the source material for the bogus

19　　letter that Mr. McDaniels sent to the bank.  The defendant knew

20　　that Mr. Moore was a real person so you can check the box for

21　　that third element.

22　　　　　Finally, did Mr. McDaniels' use of the letter have some

23　　purpose or effect with respect to the request for loan

24　　forbearance?  Again, the only answer the evidence permits here

25　　is yes.

1        Remember the time line.  Mr. McDaniels tells Gabe Brown

2   over the phone that he received the letter from the state

3   notifying him that the state had suspended rent payments.

4        Mr. Brown tells Mr. McDaniels, if you want that loan

5   forbearance, we need documentation.  I need a letter from the

6   state before I can send your request to the credit committee.

7        Mr. McDaniels created the letter, used Mr. Hoover's name

8   on it to bolster his fraudulent request for loan forbearance.

9   There was no other purpose in sending that letter into the

10  bank.

11       So again, ladies and gentlemen, we submit to you that with

12  respect to Count 3, aggravated identity theft, that the

13  evidence shows overwhelmingly that each of the elements are met

14  and that he committed the crime that he's been charged with.

15       Now, I'm almost done, but before I sit back down, I want

16  to sort of zoom back out from the details of bank records and

17  the testimony and leave you with one more thought, and it's an

18  important one.

19       We all have jobs to do here.  Agent Maloney's job was to

20  investigate this case, to collect the records, to interview the

21  witnesses, to put the pieces of the puzzle together to make

22  sure that the allegations were understood.

23       It's my job to present the case to you, to represent the

24  United States here in the courtroom.

25       It's Mr. Lyons' job to represent Mr. McDaniels and to

1    defend him against these charges.

2         It's the judge's job to instruct you on the law and to

3    make sure that we all follow it.

4         And now that all the evidence is in, it's your turn.  It's

5    your job to decide the case.

6         A grand jury can return an indictment, a grand jury can

7    say this person should be accused of these crimes.

8         But only you, the members of this jury, can decide whether

9    or not he's guilty of them.

10        Thank you for serving on this jury.  You have been

11   patient, you have been attentive.  You have done your duty as

12   Americans.  You've taken an oath to follow the law, and you've

13   paid careful attention to each piece of evidence.

14        When you go back in that jury room to review the evidence,

15   you consider the crimes that Mr. McDaniels has been charged

16   with, his actions, his state of mind, you will find beyond a

17   reasonable doubt that this defendant, Mr. McDaniels, is guilty

18   of all of the crimes he has been charged with, and I ask you to

19   find him guilty.

20        Thank you.

21        THE COURT:  Thank you, Mr. McCaffrey.  You can reserve the

22   balance of your time, you have eight minutes remaining.

23        MR. McCAFFREY:  Thank you, Your Honor.

24        THE COURT:  Mr. Lyons, you may present your closing

25   argument.

1          MR. LYONS:   Thank you, Your Honor.

2          May it please the Court.

3          THE COURT:   Mr. Lyons.

4          MR. LYONS:   Mr. McCaffrey.

5          Good morning, ladies and gentlemen.   It's a hard act to

6     follow.   Mr. McCaffrey is a fine lawyer.

7          First, let me thank you for your attention and patience,

8     and I appreciate your attention to this case.   Bank fraud cases

9     aren't always the most scintillating in terms of the evidence,

10    so I recognize that it takes some effort to pay the kind of

11    attention that we've asked you to pay.

12         Closing argument is my chance to interpret and try to

13    discuss with you the evidence in the case, and specifically how

14    it relates to the instructions that are given to you by the

15    Court.

16         Thankfully, Mr. McCaffrey went through some of the

17    elements and showed those to you so I don't have to read those

18    to you again, but I will try to relate to them as they relate

19    to my argument, okay?

20         Now, the defendant is charged with three crimes.   We know

21    it's bank fraud in connection with the April 19th loan request

22    from Kentucky Bank.

23         Bank fraud in connection with the request for deferment

24    and the interest-only payments in April of 2020.

25         And identity theft for using Mr. Hoover's name on the

1    letter that Mr. McCaffrey just got finished showing to you.

2         And I'm going to discuss each of those in turn, but I need

3    to be candid, upfront about something.

4         My dad used to say you can't put lipstick on a pig, claim

5    it's your girlfriend and tell me it's pretty.  There are lies

6    in this case.  Mr. McDaniels told lies.  Mr. McCaffrey has

7    detailed those lies for you.

8         It's regrettable and it's wrong.  It is not my job here to

9    try to convince you that it's okay to lie, it's okay to give

10   false statements to a bank.

11        But we're not here just to determine whether or not what

12   Mr. McDaniels did was wrong.  What we're here to determine is

13   whether or not the government has met all of the elements of

14   the offense, as they have been instructed by the Court, that is

15   necessary for you to find him guilty of the events -- of the

16   crimes charged.

17        What I would like to do is start with the easier counts,

18   if you'll indulge me, and I would like to talk about Count 2

19   first because it's the simpler count from my perspective.

20        This is the count having to do with the loan deferment and

21   the letter Mr. McDaniels submitted in support of that request.

22   Instruction number 14 tells you that there are four elements

23   and one of the elements is not in dispute.  It's not in dispute

24   that the bank was federally insured, so basically three

25   elements.

1        Mr. McDaniels knowingly executed a scheme to defraud or

2   cheat the bank, or attempted to do so, and deprive it of

3   something of value, that the scheme included material

4   misrepresentations on a material fact, and that the defendant

5   intended to deceive the bank and deprive it of something of

6   value.

7        The evidence, I submit, falls short of proof beyond a

8   reasonable doubt as to these elements for a few simple reasons.

9        A number of the witnesses, including Mr. Maloney,

10  Mr. Hoover, and Mr. Brown all testified that the letter on 4/6

11  was fake.  But was it material?  Did it deceive the bank and

12  did it deprive the bank of something of value?

13       The evidence, and I think it's undisputed, the evidence

14  shows that Vonnie submitted the letter on April 6th, 2020 to

15  Gabe Brown.  Mr. Brown told Vonnie that he would be taking that

16  letter to the loan committee and that he would present it on

17  April 9th, 2020.

18       If you look at Defense Exhibit Number 12, you will see

19  that is the sequence of events that Mr. Brown testified to.

20  The evidence and the testimony from Mr. Brown shows that he

21  realized that the letter was bogus or not right, inappropriate,

22  whatever term you want to use, and he had no intention of

23  taking that letter to the loan committee to approve any request

24  from Mr. McDaniels.

25       You should look at Exhibit Number 14, because that is the

1  memo from Mr. Brown to the bank's higher authority, saying this

2  is precisely what happened, that is the sequence of events.

3      Why is this important?  Because the circumstances here,

4  contrary to what Mr. McCaffrey said, the letter could not

5  have -- because of circumstances, the letter couldn't be

6  material as required by element 2 under instruction number 14.

7      Now, Mr. McCaffrey showed you the definition of

8  materiality on the slide.  And I want to repeat that, because I

9  think we need to pay careful attention to the words.

10     Materiality is defined as a misrepresentation of fact that

11 has a natural tendency to influence or is capable of

12 influencing a decision for a person of reasonable prudence.

13 That's the essence of the instruction.

14     "Capable of influencing a decision."  I submit to you that

15 you cannot influence a decision when no decision was ever going

16 to be made.  There was no possibility of a decision being made

17 on that particular request.

18     Mr. Brown testified that he had no authority to approve a

19 loan or approve a forbearance of this size.  And he told you

20 that the loan committee itself has to approve these things.

21     So while the scheme does not have to be successful, and I

22 acknowledge that, the jury instructions tell you that, the

23 scheme does have to be material.  The representation does have

24 to be material.  And I think in this situation it is not.

25     Secondly, did Mr. McDaniels really have the intent to

1   cheat the bank here?  Which is element C on instruction

2   number 14.

3       Mr. Brown indicated that Mr. McDaniels was calling him to

4   inform him that no deferment was going to be needed.  If you

5   look at Defense Exhibit Number 14, you'll see the sequence of

6   emails between Mr. Brown and Mr. McDaniels in which

7   Mr. McDaniels is saying, I do not need the deferment, I have

8   good news, I can bring the loan current.

9       And Mr. Brown basically refers Vonnie to the counsel for

10  the bank.  So it appears at least that Mr. McDaniels had the

11  intention of withdrawing his request for deferment at the time.

12      Thirdly, did the letter and the request for the

13  forbearance deprive the bank of something of value?  Now,

14  Mr. McCaffrey came up with an interesting argument, that it

15  deprived the bank of something of value because forbearance on

16  the loan would have created a backloading of the principal

17  payments that Mr. McDaniels would not have to make.

18      Those $7,000 and $14,000 numbers are not money that the

19  bank would -- that the bank wouldn't get.  The whole purpose of

20  having a deferment is that you pay the interest only, which is

21  part of what the bank is making its profit on.

22      And the balance, the principal balance is just added to

23  the back end of the loan.  There's no money being received or

24  cheated from the bank in connection with this particular

25  transaction.

1      So I submit to you that there is at least a reasonable

2  doubt as to whether or not the bank was deprived of something

3  of value in connection with this particular count.

4      For those reasons, I'm going to ask you to find the

5  defendant not guilty on Count 2 of this indictment.

6      Count 3 of this indictment, I can spend very little time.

7  Because the truth is there is only one element that really

8  matters from my perspective.

9      Mr. McCaffrey has shown that Mr. McDaniels submitted a

10  letter without lawful authority of Mr. Hoover, that he knew who

11  Mr. Hoover was.  I don't deny that.  But the jury instructions

12  tell you and the judge has instructed you that if you find that

13  he is not guilty on Count 2 of the indictment, which is the

14  deferment issue, that you must find him not guilty on Count 3

15  of the indictment.

16      You can't have the aggravated identity theft in the

17  absence of the fraud that's committed in Count 2 of the

18  indictment.

19      So now turning back to Count 1, which is the original loan

20  request.  We walked through the elements so I'm not going to

21  repeat those there.

22      But I do want to mention one of the other jury

23  instructions that the Court has given you, it's instruction 15,

24  and it talks about the good faith of the defendant.  And it

25  tells you that good faith is inconsistent with an intent to

1    defraud.

2          It defines good faith as beliefs honestly held and absence

3    of ill will, and an intention to avoid taking unfair advantage

4    of another.

5          It also tells you, and I should be candid about this, the

6    defendant does not act in good faith even if he has an honestly

7    held or certain beliefs and he has -- he knowingly makes false

8    or fraudulent representations in connection.

9          Defense does not have to prove that he acted in good

10   faith.  Instead, the U.S. must convince you beyond a reasonable

11   doubt that his intent was to defraud the bank here.

12         So has the government presented proof that the defendant

13   knowing executed a scheme to defraud the bank with material

14   misstatements and deprive it of something of value?

15         Let's talk about the evidence on Count 1 for a few

16   minutes.

17         Mr. McCaffrey went through each of the documents that

18   Mr. McDaniels submitted.  And I've already admitted to you that

19   those documents are false and that they were not accurate.  The

20   question is, really, whether they were material.

21         So let's talk about the $40,000 saving accounts balance.

22         The testimony I believe, although there was some conflict

23   in it, is that the $40,000 savings account balance was being

24   earmarked for the down payment on the loan.  Remember, the

25   defendant had to come up with almost 67, 68, almost $70,000 in

1    order to close on this loan.

2         The purchase price was 450.  The loan balance -- the loan

3    was going to be 382,5, so he had to come up with almost

4    $70,000.

5         Government Exhibit 8, I think, is the best evidence on

6    this issue.  Because although Mr. Brown and Mr. Swinford both

7    talked about this issue of the savings account providing

8    liquidity, meaning back-up money in the event that the loan

9    went into default, the intent of the parties is shown by

10   Mr. Swinford's analysis.

11        I would like to show that on the Elmo, if I might.

12        THE COURT:  Yes, sir.

13        MR. LYONS:  Now, this is not a document Mr. McDaniels

14   submitted, this is the analysis from the bank when they were

15   reviewing the records.

16        Point number 2 says that the down payment for this loan

17   request is $70,500.  However, Mr. McDaniels lists only $40,000

18   in deposit accounts on his personal financial statement.

19        And then it has a lender response.  The lender is

20   Mr. Brown responding to this issue, and he says:  Mr. McDaniels

21   will be supplementing the down payment with his $62,000 HELOC

22   at Navy Federal Credit Union.

23        Why is that important?  Because when a case comes to

24   trial, witnesses know that they are going to have to justify

25   their actions.  And they are going to have to perhaps testify

1    about things with regard to what the purpose was.

2         Now, Mr. McCaffrey and the bank employees have tried to

3    spin the $40,000 as somehow a reserve account that

4    Mr. McDaniels was supposed to have in the event that the

5    loan -- the stream of payments stopped.  But that's not what

6    the analysis shows.

7         The analysis very specifically shows that the savings

8    account and the HELOC account, both of which involves some of

9    those false documents, was intended for the down payment.

10        Another point that was neglected to be discussed earlier,

11   at the time of the loan -- the application was on February 4th,

12   2019, Mr. McDaniels submitted to the bank -- or he didn't

13   submit to his bank -- his Navy Federal Credit HELOC loan on

14   April 5th, 2019 was $38,000.

15        So in his mind, he had $38,000 in the HELOC account, not

16   that far off in terms of the $40,000 that he was representing

17   to the bank.

18        So let's talk about the lease.  No question that

19   Mr. McDaniels altered the term of the lease.  He added years to

20   the term of the lease.  And you heard the bank's testimony,

21   Mr. Swinford in particular, that said that the length of the

22   lease represents the stability of the stream of income that's

23   going to be used to pay back the loan.  That that was important

24   to the bank, that was material to the bank.

25        Except both Mr. Brown and Mr. Swinford admitted that the

1  state had the right to terminate the lease for any reason, for

2  any reason, at basically any time.  So how was this stream of

3  income so stable that the bank was going to rely upon it

4  exclusively, basically, when in fact the state could withdraw

5  it on its own whim?  Common sense tells you that the bank saw

6  the state as a stable lessee of the building.  That makes

7  perfect, good sense to me.

8      And that the amount of payments, if you look at the amount

9  of payments under the lease, they were well above what was

10 going to be necessary -- was going to be necessary to make the

11 payments on this particular loan.  That's what the bank was

12 counting on in making this loan, I submit to you.

13     Mr. Brown, as important as the lease was, couldn't

14 remember whether he read it.  Do you remember him saying that?

15 He couldn't remember whether he even read the lease.

16     Mr. Swinford says he did, says he was aware of the lease

17 provision, and says he understood that the state could back out

18 with 30 days' notice.

19     So was the lease alteration wrong?  Absolutely.  Was it

20 material to the bank's decision?  I submit to you that it was

21 not.

22     We know that the loan closed on August 12th, 2019.  And

23 here's what we know.  We know that Mr. McDaniels came up with

24 the $67,500 that was necessary for him to close the loan.  All

25 of the concern about the credit cards, about the HELOC, about

1    the other balances had just evaporated.  He made the payment.

2    He purchased the building.

3        He then began making the payments.  You saw from the

4    document we introduced with Mr. Brown that there were eight

5    payments between the time of the loan closing and the time of

6    the forbearance request.  Seven of those payments were made.

7    You can look at the exhibits and see that.

8        You can also see that, in between the time when they were

9    texting about this loan forbearance and the time when the

10   letter was submitted from Mr. Hoover, there was another payment

11   on April 3rd.

12       Mr. McDaniels was trying to pay this loan.  He was

13   committed to paying this loan.  He messed up when he told him

14   that the bank was still in there.  I mean, how do you do

15   something so dumb?  I don't know the answer to that question.

16   I don't.  People get scared sometimes and they make mistakes.

17   They make mistakes.  And I acknowledge that to you.

18       Now I want to say a couple more things and then I'll sit

19   down.

20       With regard to the PPP loan, Mr. McDaniels is not on trial

21   for the PPP loan.  The judge told you you could use it for a

22   very specific purpose, and that is to show Mr. McDaniels'

23   intent to commit -- an intention to defraud the bank on Count 1

24   and Count 2 of this indictment.  Please use it for that

25   purpose.  It doesn't prove anything else, and he is not on

1   trial for those charges.

2       The second thing is the confession.  How do you try a case

3   where there's a confession?  Here's my thought.  The confession

4   shows, I think, that -- let me back up.  Mr. Maloney

5   indicated -- or Agent Maloney indicated that he went and talked

6   to Mr. McDaniels, and he met him at a park.  And that he was

7   going to interview him about the circumstances of this loan and

8   the documents that he had found.

9       Another agent was with him, being Agent Jeff Eden as I

10  recall his name.

11      Mr. Maloney was careful in showing Mr. McDaniels the

12  documents and getting him to initial the documents that he

13  believed were false.  And Mr. McDaniels readily did so,

14  cooperated and came clean with him.

15      But most of the testimony of Mr. Maloney about what

16  happened at that interview had to do with why Mr. McDaniels did

17  what he did.  Why did he submit the documents?  Why did he

18  submit the letter from Mr. Hoover?  None of that is written

19  down.  The evidence that you have about that comes from the

20  testimony of Agent Maloney.

21      Did he record the interview with Mr. McDaniels so that we

22  could hear it, so that we could verify the accuracy of what was

23  said?  So we could be sure he didn't make a mistake in

24  understanding what was being said?  He did not.  He said he

25  doesn't record non-custodial interviews, he only records

 1    custodial interviews.

 2         The second point I would ask you to consider about that is

 3    this.  There was another person there, there was another person

 4    there who could confirm all of these statements that

 5    Mr. Maloney said that Mr. McDaniels made, Agent Eden.  We

 6    didn't hear from him.  I don't know why we didn't hear from

 7    him, but we did not hear from him.

 8         Ladies and gentlemen, I would ask that you carefully

 9    consider the evidence in this case.  You'll have the exhibits

10    back there with you.

11         And at the conclusion of your deliberations, I am

12    requesting that you find the defendant not guilty on all three

13    counts of this indictment.

14         THE COURT:  Thank you, Mr. Lyons.

15         Mr. McCaffrey, you have eight minutes of your time

16    remaining.

17         MR. McCAFFREY:  Ladies and gentlemen, I'll be brief.  I

18    just want to respond to a couple of the points that Mr. Lyons

19    made in his closing.

20         Let me start with this concept of good faith.  The Court

21    instructed you that good faith is a complete defense to the

22    bank fraud charges that have been levied against Mr. McDaniels.

23         Let me informally think of it this way, and you might

24    think of it the same way.  Good faith is the flip side of the

25    intent coin.  If you intend to defraud the bank, you're not

1    acting in good faith.

2         And there is a paragraph in this instruction that I want

3    you to pay attention to when you go back to deliberate, and

4    it's this:  A defendant does not act in good faith if, even

5    though he honestly holds a certain opinion or belief, that

6    defendant also knowingly makes false or fraudulent pretenses,

7    representations or promises to others.

8         Mr. McDaniels knowingly made false or fraudulent

9    pretenses, representations, or promises to the bank.  He did

10   not act in good faith.  He acted with the intent to trick the

11   bank and to get something of value from it.

12        With respect to materiality, I want to speak briefly to

13   that.  Count 2, this is the loan forbearance request.  Was that

14   fraudulent request, was the lie about COVID affecting the

15   state's ability to make rent payments, was that capable of

16   influencing the bank?

17        Mr. Lyons told you that there was no possibility of a

18   decision being made, and I submit to you that's not what the

19   evidence showed.  A decision was made.  Mr. Brown took the

20   letter he received from Mr. McDaniels, he filled out a

21   forbearance request form and he sent it to the credit

22   committee.  He believed the lie initially.  He acted on it.

23        He later became suspicious, and again, he withdrew it.

24   That was in the bank's best interest.  It's a good thing he did

25   that.  That doesn't mean that the lie wasn't material.  He made

1   a decision, he acted on it.  Was the misrepresentation capable

2   of influencing him?  And the answer there is yes, it did

3   influence him.

4        Now, Mr. Lyons also told you that Mr. McDaniels didn't

5   really mean to ask for this forbearance, that he tried to

6   withdraw it, and he referenced Defense Exhibit 14.  Take a look

7   at that email.  That email from Mr. McDaniels to Mr. Brown

8   saying hey, I don't need the deferment anymore.  That is dated

9   May 11, 2020, more than a month after he sent in the request

10  for forbearance.  Way after the bank had already figured out

11  that it was fake, way after the bank and the state had referred

12  this to law enforcement.

13       So he attempted to say, hey, you know, just joking, I

14  didn't really mean that about the loan forbearance, that was

15  well after the action that had been taken and well after his

16  lie had been detected.

17       Count 1, the slew of false documents that were submitted

18  to get the loan.  That was a suggestion or an argument that the

19  bank account information and the HELOC information, that that

20  only really mattered to his ability to make a down payment.

21  That wasn't the testimony of the witnesses.

22       Now, it's your job to decide whether you thought they were

23  credible and whether you believe them.  But their testimony,

24  what Mr. Swinford said was the cash on hand was important to

25  make sure the borrower could repay the loan, not just the down

1    payment, but to repay the loan.

2        Let's assume for a minute, though, that the only relevance

3    of his bank balance and his home equity line of credit balance

4    was to make a down payment.

5        We know from the evidence that he needed to come up with

6    67,000 or $70,000, that's what the bank was looking at when it

7    was assessing the loan.  How much of a down payment?  We know

8    that he had $5 in the bank, and we know that he had $6,700

9    available on his line of credit as of June when the bank was

10   drilling into this issue.  So that's $6,705 available.

11       The bank needs evidence that he can pay $70,000.  Use your

12   common sense.  The bank is not going to proceed with this loan

13   if the borrower, who needs to show ability to make a $70,000

14   down payment, can only show ability to make a $6,000 down

15   payment.  So even if it were just limited to that issue, it

16   still mattered.  The lie still mattered.

17       Finally, there was some mention of this confession and

18   whether or not you can believe the testimony of Agent Maloney.

19   Again, your job is to assess the credibility of the witnesses,

20   to weigh the testimony that they gave.

21       But you don't just have to take Agent Maloney's word for

22   it.  His testimony is corroborated by the documents themselves.

23   The documents show the lies.  His testimony was consistent with

24   what the documents show.

25       And with respect to why, the why of Mr. McDaniels sending

1   in these records, why did he do it?  Again, common sense.  Use

2   your experience.  Why send in false record after false record

3   after false record after false record as part of the loan

4   application if the purpose of doing so wasn't to influence the

5   bank and to get the money?  There is no other logical

6   explanation for why he would tell these lies, other than an

7   intent to trick the bank and get something of value.

8        Ladies and gentlemen, the evidence in this trial proves

9   beyond a reasonable doubt that Mr. McDaniels committed the

10  crimes he's been charged with, and I ask you again to find him

11  guilty.

12       Thank you.

13       THE COURT:  All right.  Thank you.  Thank you, counsel.

14                   (Excerpt concluded.)

15                 C E R T I F I C A T E

16       I, Linda S. Mullen, RDR, CRR, do hereby certify that

17  the foregoing is a correct transcript from the record of

18  proceedings in this above-entitled matter.

19  /s/Linda S. Mullen            June 24, 2022
    Linda S. Mullen, RDR, CRR     Date of Certification
20  Official Court Reporter

21

22

23

24

25